Our first case for this morning will be Craig Canter against the AT&T Umbrella Benefit Plan No. 3 in AT&T Services, and we're ready to hear from you, Ms. Rowe. Good morning, Your Honors. May it please the Court. My name is Elizabeth Rowe, and I represent the appellant, Craig Canter. This is an arrest of matter. It's on appeal from a motion for summary judgment, and Mr. Canter is seeking a reversal of the disability plan's termination of his short-term disability benefits and reinstatement. You know, I may have a little problem hearing. Okay. I think you would be all right. If you're comfortable, you are certainly more than six feet away from us, if you'd prefer to. I think we could hear you a little better without the mask. Okay, we have to. Thank you. So Mr. Canter is, he was a premises technician for AT&T for several years, and that is a job duty that has very heavy duties consisting of climbing 28-foot tall ladders several times a day to work on electric wires. He'd do that while wearing equipment, an equipment belt weighing as much as 15 pounds. Do I recall that there was somewhere in the record that he needed to go up and down these ladders as much as seven times a day? Yes, he reported climbing ladders that many times a day. And so, as you could imagine, it's a job that required a good amount of exertion and placement for precarious position that was dangerous and had high risks if there was any sort of mistake. In February of 2017, he began suffering from dizziness and migraines. He applied for disability based on the finding that experiencing dizziness, it would be unsafe for him to climb, lift, or drive. But as I read this record, it looked as though, to me, you can tell me if this is wrong, but he begins to get these benefits on February 13th, and then for a while there's a month-to-month extension of these short-term disability benefits because the doctors keep writing back. But then finally they get a letter that indicates that things are getting better, so that's why they terminate the benefits effective July 6th. And a lot of this turns on the plan's requirement of objective medical evidence, so maybe you could talk about that. So he was sending monthly progress reports, and they were extending those benefits, and they cited specifically in extending those a finding that he exhibited a mild sway on the Romberg test, which is an equilibrium test. It tests a person's balance. He continued to exhibit a mild sway on the Romberg test that entire time during his July 3rd visit, which was the last progress notes that caused them to terminate his benefits. He still exhibited a mild sway, but he had reported temporary relief with some of his symptoms. He wasn't having headaches as often, and his persistent dizziness had resolved. He did, however, complain to his doctor that he was feeling dizzy on exertion doing things such as mowing the lawn, and that dizziness would last for approximately an hour or so. So let me ask you this. Why is dizziness one of those subjective things such as pain? We certainly have said that pain can be self-reported, and it's sometimes difficult to pin down a physical cause of pain. People experience pain. But dizziness, you would think, you studies or inner ear balance, there would be a physical connection somehow, and the plan required that. And I don't know if we have one of those things for which that requirement is impossible. Well, as far as I know, the Romberg test is one of those tests that measures your functional limitations on dizziness. Dizziness, as I understand, is something you are experiencing inside your head. You can't necessarily quantify that through any sort of laboratory test. I was just going to say, there are several different physical sources that it may come from, and I guess his tests were coming back normal, which was one thing that concerned the plan. So his test results, his doctor was trying to figure out what the cause of this dizziness was, and it could have been several different things. The first step was to try cardiopulmonary testing. That largely came back negative, but he was still experiencing dizziness, and he was still, he still exhibited this mild sway on the Romberg test, and that had been a basis for awarding benefits in the first place. At no point did they inform him of what, if there was some specific test they had in mind that could guide him in curing his, any sort of problem with his appeal, they should have given him that information to tell him what he needed to do to fix it. But from his perspective, everything he had been doing up to that point had sufficed for them to make a finding of disability, and he was left without any information as to what he needed to do to fix it. And this court has held several times over that procedural reasonableness is the cornerstone of the arbitrary and capricious review. That requires that the plan weigh all evidence in favor and against, and specifically and clearly articulate to the participant the reasons for their decision, including the reasons for rejecting any sort of evidence in his favor. They articulate, they, at no point, none of the three reviewers discussed the fact that there was a Romberg test. None of them gave many indication they even considered that. They never discussed his dizziness with exertion, which, although subjective, does require some explanation for why they still think he can climb ladders wearing 15 pounds of tools and work with electricity despite making that complaint. They can't just dismiss it out of hand because some of his cardiopulmonary tests came back negative. That is arbitrary and capricious, and this court has held several times over as well that the failure to consider or address evidence weighing in favor of a participant is a hallmark of arbitrary and capricious review. He was denied a fair opportunity to really fully and fairly address his evidence and take the steps that would have satisfied AT&T because they gave him no indication of what he would need to do to make his claim stronger. What he had been sending up to that point... Did they have that obligation to tell him what tests to take? Not necessarily, but I'd say especially here where a Romberg test had satisfied them, and it's a subjective test and it's a subjective complaint, a symptom that doesn't necessarily evidence itself through laboratory tests. There are cases, I believe, in Holstrom, yes, the court held that if the administrator believes that a procedure must have certain characteristics or that it must be performed by a certain kind of professional, it must provide at least some level of guidance unless the test sought is so well known that a claimant or her attorney or other representative can reasonably be expected to know what the administrator expects. Here, if there was some sort of test they had in mind that they felt could have proved his dizziness, they should have articulated that to him so that he could take steps to rectify it. Instead, they've cherry-picked statements from his file and determined that he wasn't reliable in his complaints of dizziness, despite having this difficult, dangerous job, and they gave him zero opportunity to fairly address, or even they gave him no indication of what they did consider other than these negative test results, which only proved what wasn't the source of the problem. It didn't prove that he didn't have a disability. And so all of these arbitrary and capricious steps, in our opinion, they caused him to lack what ERISA requires in presenting his full case to the plan, and because he was already receiving benefits, the proper remedy would be to restore benefits. Is there any other objective evidence that you're pointing to, other than the Romberg test, that you believe the plan administrator ignored when making the determination? They also ignored that he had these abnormal pulmonary function tests. It said they kept representing them as normal in their brief, but actually the test results said that they were abnormal. They never took steps to investigate what that meant. The best objective evidence would be the equilibrium test, which we've cited some cases that have shown that that is a functional capacity test as far as balance goes. But it's one for which there could be many degrees. Apparently, this isn't in the record, and it should be, but it seems that a great number of people have at least some sway, whether it's a little or whether it's a lot. It doesn't seem to be quantified and tied to the dizziness. The question on arbitrary and capricious review is, can you see how the plan resolved all of the evidence in front of it in favor of the decision that it came to? They didn't address that test at all, so if they felt that that wasn't sufficient, they needed to let him know so that he could have taken steps to find a test that would satisfy them. They gave him no opportunity, really. That was the problem. And then when deciding his job accommodation claim, where they would give him time off without pay under the exact same standard that they applied for their disability plan, they then did reach the determination that he was unable to perform the functions of his job with or without accommodation. Did he single out this failure to discuss the Romberg test on his appeal, his internal administrative appeal? He filled out the form they gave him that said, fill in your doctor's information and give us a brief description of why you're appealing. He's just an average worker. He's not sophisticated in what ERISA requires in terms of making your full case. So he was under the belief, and based on what they told him, that they were going to contact his doctors and take those affirmative steps to get what information they needed. And the record shows that the independent reviewers took woefully inadequate and in some cases nonexistent attempts to reach the two primary providers who he had been seeing. For example, the first medical reviewer made one single attempt to contact the provider on the day she prepared her report and later decided that when she didn't get a call back, she'd finalize it and send it. She also reviewed only a single date of service from his five months of treatment in making her decision. The other two medical reviewers on appeal were equally negligent in their attempts to reach the provider, despite making him think that this was going to be a part of the compilation of his administrative record. His doctors tried several times to call Mr. Friedman back, often within 45 minutes of receiving his call, and Mr. Friedman would not answer the call and would go to a message saying his voicemail was full, so they were never able to inform that provider that they were trying to reach him. The other doctor only called his pulmonary specialist, whom he had seen only once and didn't know as much about his long-term condition and had ruled out that as the issue. So that wasn't an adequate undertaking on their part. If there are no other questions, I'd like to reserve the rest of my time. That's fine. Thank you. Mr. Stockard. Thank you, Your Honor. May it please the Court, we're here to evaluate a plan's decision to deny short-term disability benefits principally, and everyone agrees that's arbitrary and capricious review, and the Seventh Circuit's clearly articulated what that means. It means that the plan has to offer a reasoned explanation based on the evidence and rational support in the record for its decision. It's a very deferential standard of review to the plan and its decision and its plaintiff's burden to show that it's arbitrary and capricious. Now, is it your opinion that under arbitrary and capricious review, the plan has full discretion over how to build the record, that they can throw pieces of evidence in the wastebasket if they just don't feel like dealing with it? Your Honor, that is not my position. And more importantly, the plan personnel that were involved and the independent medical reviewers absolutely did not do that here. They very carefully reviewed evidence in the record. So, for example, there is some suggestion that that mild sway on Romberg test was never considered. Actually, when you look at it, the Sedgwick records noted that that mild sway on Romberg test was present early on, and they noted that that test was a finding within normal limits. And then they also had that Romberg test finding available to all of plaintiff's own doctors, all of whom did not notice or in any way indicate that that test showed a functional limitation on his ability to perform any parts of the job. Aren't we guessing, though? I mean, there's no discussion. Even a sentence might have done it, a sentence that sounds like what you just said. If one of the reviewers or if somebody at Sedgwick had said, We're not placing any weight on this Romberg test because it was within normal limits or we're not placing any weight on this Romberg test because we're persuaded that the rest of the evidence is more compelling or something like that. Your Honor, in its final denial decision, Sedgwick did note and say that we do note that there are some findings which could have included the Romberg test and the fact that he had self-reported symptoms of dizziness upon exertion. But it said, Overall, there is no objective medical evidence that shows that that shows functional limitations. And it's important to note that a positive finding on the Romberg test says absolutely nothing about how that would have impacted Mr. Cantor's ability to do his job. So are you saying that somebody who's dizzy should be climbing up to the top of a ladder and performing work? Your Honor, what I'm saying is when you look at the overall evidence which is in the administrative record, when you look at the plan terms which specifically say that self-reported symptoms are not enough to qualify you for disability benefits under this plan, and when you look at the fact that his treating neurologist gave what his own general practitioner described as a thorough negative neurology workup, when he was referred to that doctor and that doctor performed lab results, all of which were normal, performed a chest x-ray, all of which was normal, an echocardiogram, a stress echocardiogram, which was normal, and then referred him to a pulmonologist, and that pulmonologist did a pulmonary function test that was normal and then spoke to the independent reviewers and said, Look, he is fine. He is not disabled from a pulmonology perspective. And when the independent medical reviewers noted, like Dr. Duval did in their review, that he had reported shortness of breath upon exertion, and when they noted that there were times where he had reported dizziness on exertion after mowing the lawn, that those independent medical reviewers had actually reviewed and considered those factors and those self-reports is absolutely reflected in the administrative record. And what they said is, overall, with all of these objective test results that are normal, that information would not outweigh and doesn't outweigh. Those limited findings do not show that you have met the burden under the plan to show objective medical evidence supporting your disability. Okay, so one thing that troubles me, it's fine to have these, I mean, of course, one normally would have these independent reviewers, but I'm very disturbed by the failure to put in front of those independent reviewers the rest of his records, mainly. Basically, what Ms. Rowe was saying, the failure to get in touch with his treating physicians, you know, one phone call and give somebody 45 minutes to call back and then say, well, I guess they didn't call back, but let's forge ahead. I'm not sure the independent reviewers were operating with a full deck. Your Honor, those assertions are not supported when you look at the record. The independent medical reviewers absolutely had access to all of the doctor's notes and information and all of the test results that were provided by Mr. Cantor as a part of the administrative process. And Mr. Cantor had a very robust opportunity in the plans, claim, and appeal process to present every type of evidence that he wanted and also any argument that he wanted, including an argument that this Romberg test should have been given more weight. And he never made that argument in the process. So let me just, to clarify, are you saying that all of the written records from his treating physicians were in front of the reviewers and the only thing that didn't happen was a conversation? That is, some conversations did not happen, Your Honor. Those written records absolutely were in front, and they're noted. The independent reviewers noted all of those test results when they looked at the overall circumstances of his medical file and specifically noted those negative test results, the fact that he was, from a pulmonary perspective, totally fine. In fact, one of the independent reviewers, Dr. Jiva, spoke with a pulmonologist, Dr. Keller, and asked him about it and got that report from Dr. Keller that it was fine. The other independent reviewer on appeal, Dr. Friedman, actually spoke to someone at Northwest Neurology, one of the doctors. It wasn't the physician assistant that had actually spoken to him on several times, but he actually did speak to the doctor. It was over Dr. Kazmakas, who was over the overall treatment plan. So there's evidence in the record that this wasn't just a phone call and no return. They actually called. The first reviewer called, didn't get a return call. She issued her report, but then before that... That's Duvall, right? That's Duvall. Before they got to the appeal independent reviewers, they told Cantor that they were going to have the independent reviewers reach out and that he should try and encourage them to speak. They also went and faxed a letter to all of the treating providers and said our independent reviewers are going to be calling you. Please be ready. There's evidence that the pulmonology appeal reviewer, Dr. Jiva, spoke with the pulmonologist for plaintiff. There is evidence that Dr. Friedman called twice to Northwest Neurology, spoke with one person, just not the nurse practitioner, Dr. Jackson, and actually left two messages for Dr. Bang, the generalist. So there is abundant evidence in the record of very reasonable attempts by the plan to try and get in touch with these treating providers and have a conversation with them. However, having a conversation with them is not a requirement for an ERISA plan administrator. In Jett v. Blue Cross Blue Shield of Alabama, the 11th Circuit and other courts have recognized that it's not a requirement to make a decision on benefits under an ERISA plan that you have to speak to a treating provider. You can if you want to, but it's not required. And here, when you look at the reasonable attempts that have been made to suggest that the plan needed to go further and needed to keep trying and keep trying and delaying the decision until they absolutely could have spoken to each one, puts far too high a burden on ERISA plan administrators for making their decision. And that's particularly true when you look at the district court decision below here where the district court specifically noted that all of the records that were presented by all of those treating providers were uniform in finding no positive test results that indicated that he had a functional limitation that would prevent him from performing any duty of the job. But, of course, the one piece of evidence in the record that seems to point in the opposite direction is the job accommodation standard where there's a finding that he, in fact, can't perform his work. Now, of course, he goes on unpaid leave for that. And I understand your argument to be, well, they don't look for objective evidence. It's enough to say that he can't. But it seems unrealistic to me to think that the company just says, oh, fine, we'll put you on a job accommodation leave of absence without serious reason to do so. Your Honor, the first thing that I point out about this, and I think this timing is essential for everyone to consider, that job accommodation decision was made six months after the plan had already made its decision. So the plan had issued its final appeal decision here, and that job accommodation decision didn't even come down until six months later. So are you saying he became disabled during this period of time and just wasn't getting benefits? I'm saying, Your Honor, that the fact that what may have transpired in those six months or what his medical condition may have been at the time that decision was made by the company was absolutely not in front of the fiduciary of this plan that was charged with making the decision  that that's their sole decision, fiduciary decision under the terms of the plan. And they had no knowledge of and could not possibly have had knowledge of something that happened six months later. So to suggest that somehow that can be brought in to be evidence to undermine the decision and suggest that it was arbitrary and capricious not only ignores who ERISA charges to make the fiduciary decision, which would be the claims administrator under the plan, but it also would ignore the fact that time had passed and it was illogical, and that could mean plan administrators would have to revisit decisions they made six, 12, 18 months later based on employer inquiries that were made in an entirely separate context. And it is a separate context when it comes to that job accommodation determination. A disability determination under this plan is about objective medical evidence and the plaintiff putting that information in front of a fiduciary plan administrator and that's satisfying the fiduciary claims administrator that there is definitely... So can I ask you, would the plan then never find disability for somebody with fibromyalgia? Your Honor, what the plan would do in that decision would depend entirely on what was the record of evidence that was in front of the plan about the fibromyalgia. Right. I mean, the reason I ask is because that's a notoriously difficult disease to pin down. Its diagnosis depends on a great deal of self-reporting in the interpretation of the skilled physician who's evaluating. Your Honor, that is correct, and fibromyalgia is absolutely distinct and very different from the idea of dizziness on exertion or some type of neurological disease that impacted balance. And here you had his own doctors giving evidence of a fully negative neuro workup, being referred to a pulmonologist and a pulmonologist performing a normal pulmonary functionary test and then saying specifically, he is not disabled. That was his own treating pulmonologist decision. There are objective measures for the types of things he's complaining about and those were... I mean, that could be important. I mean, if there are objective measures, then I can imagine that the plan would insist on seeing them. If there are not, if there are some subjective dimensions to it, then it seems rather misleading for the plan to say that they're going to insist on it when they know it's not there. Yeah, and here they were looking at a history of doctors that were performing all kinds of tests that were specifically meant to get at the issues. So there would have been absolutely no reason for Cedric, the claims administrator charged for that fiduciary decision, to think that this was a condition that could not be identified or satisfied through tests. That wasn't suggested by Mr. Cantor in the appeal process in any way, shape, or form. And they were looking at doctors that were testing constantly and finding normal findings. So those would have been the types of things that would have alerted the plan, this is capable of detection and we have all negative test results here. You know, the things we have are purely self-reported symptoms or this mild sway on Romberg test, which doesn't overrule his own neurologist and his own pulmonologist. So I think there is just no way to cast this as an unreasonable, arbitrary, and capricious decision. And that job accommodation process under the ADA is one that doesn't require this type of finding and this application in these plan terms. Thank you. Thank you very much, Mr. Stockard. Anything further, Ms. Rowe? Okay, just a couple of points. You know, Ms. Stockard seems to be placing this burden on Mr. Cantor to explain why they needed to consider the Romberg test. Really, it was the plan's obligation to address all of the information he presented. They didn't address that at all. They just gave this simple sentence that, yes, there were some findings, but none so severe that you should be considered disabled. That doesn't tell him what they considered. That doesn't give him any guidance on what he needs to do to correct it. And I'd like to just draw the Court's attention to the administrative record, which was at ECF 100 on page 183 of that record. It has the form he filled out for his appeal. And you can see just kind of how bare bones this form is and what it's asking from him. It asks for his doctor's information and a brief statement from him. It has a couple of lines where he can write why he's appealing. It doesn't really give him the idea of what kind of robust record he needs to build to fix his appeal. So I think it's really misleading to state that he was given all of these opportunities to present this information to the fund. And I'd also just like to point out that the job accommodation claim, this idea that they had no idea that there's some separate entity deciding it, the record also shows on page 102 of the administrative record that they received a call. It's all logged in his same claim file that he's opened a job accommodation claim. It's clear from this log that they have all of the information relevant to this individual, including all of his efforts prior to this to get short-term disability benefits. But you're not disputing that that decision was made at a different time, under a different standard, a different context, right? I dispute that it's a different standard. I think as written it's exactly the same. There's no distinction. It's the same at AT&T Services made that decision on his job accommodation. They're also the plan administrator. Sedgwick made a decision in both instances too. They didn't actually decide that he was going to get the job accommodation, but they decided whether to recommend him for it. And so they did have that information. And it was only six months later. It's still 180 days. That's within the appeal time frame of his claim. But it's not really that far out that it's totally irrelevant. So I think that's my time. Thank you. All right. Thank you very much. We will take the case under advisement.